JAMES AHERN, as Administrator, etc., Respondent, *v.* ROSALIE.
M. STEELE et al., Appellants.

G. devised certain real estate, including a pier in the city of New York, of
which he died seized, to trustees for the benefit of his children during
their lives, and after their deaths to their children. The pier was, under
the will, set apart for the testator's daughter J., and during her life was
controlled and managed by the trustee as provided in the will. In 1880
he leased the same for a term of years, the lease provided that the lessor
should not be responsible for any defect in the premises; that he might
enter for the purpose of making repairs, but he was not bound to repair.
At the time of the execution of the lease the pier was defective and out
of repair J. died in 1881, leaving three children, two daughters and a
son, her surviving. The son died in May, 1882. In October, 1882,
plaintiff's intestate, a boy about six years old, fell through a hole in the·
pier, which still remained out of repair, and was drowned. The two
daughters of J., at the time of the death of their mother, resided in
Europe, and have since resided there. One of them brought an action
for partition of the real estate, including the pier, in which action a
receiver of the property was appointed in 1881, and an order was made
that the receiver reserve a specified portion of the receipts, to be applied,
among other things, to the payment of necessary repairs. In an action
against the daughters and the executor of the son of J. to recover dam-
ages for alleged negligence causing the death of plaintiff's intestate,
*held* (RUGER, Ch. J., DANFORTH and GRAY, JJ., dissenting), that the
defendants, having taken title subject to a valid outstanding lease which
contained no covenant binding the landlord to repair, were not responsi-
ble for a nuisance of which they had no notice, created because of failure
to repair during the existence of the precedent estate.

*Brown* v. *C. & S. R. R. Co.* (12 N. Y. 486); *McCarthy* v. *Syracuse* (46 id.
194); *Irvine* v. *Wood* (51 id. 224); *Swords* v. *Edgar* (59 id. 28); *Beck* v.
*Carter* (68 id. 283); *Clifford* v. *Dam* (81 id. 52); *Bellows* v. *Sackett* (15
Barb. 96); *Gandy* v. *Jubber* (5 Best & Smith, 76) distinguished.

*Rex* v. *Pedly* (1 Ad. & El. 822) questioned and distinguished.

The authorities on the subject of the liability of an owner of demised
premises for a nuisance thereon, collated.

Generally and *prima facie*, where lands are in the occupation of a tenant he
alone is responsible for any nuisance thereon arising from their being out
of repair. The landlord is only liable where he demised the premises
with the nuisance thereon, or covenanted to repair.

A grantee or devisee of premises, upon which there is a nuisance at the
time the title passes, is not responsible therefor until he has had notice·
thereof.

*Ahern* v. *Steele* (48 Hun, 517) reversed.

(Argued April 19, 1889; decided October 7, 1889.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made May 18, 1888, which affirmed a judgment in favor of plaintiff, entered upon a verdict, and affirmed an order denying a motion for a new trial.

This action was brought to recover damages caused by the death of plaintiff's son, an infant about six years old, who on the 8th day of October, 1882, without any fault of his, fell through a defective pier in the city of New York, and was drowned.

The material facts are as follows: John Gardner died in 1817, being the owner of the pier and a large amount of other property, and leaving a last will and testament, in which he devised the pier and the other property to trustees for the benefit of his children during their lives, and after their death to their issue. Under the will this pier and other property was set apart for his daughter, Mrs. Jane De Dion, and during her life was under the control and management of a trustee, as provided in the will. She died on the 22d day of May, 1881, leaving as her only issue two daughters, Rosalie M. Steele, Henrietta Hutton, and one son, Thomas McCarty. The son died April 14, 1882, and the two daughters and the executors of the son were made defendants in this action. At the time of the accident the two daughters then resided, and have ever since the death of their mother resided, in Europe. On the 1st day of May, 1880, the trustees rented the pier for the term of five years to Frank Phelan, for an annual rental of $750 for the first three years, and $850 for the last two years, payable monthly in advance. In the lease it was stipulated that the party of the first part should not be responsible for any latent or other defect in the premises, nor for any damage to property by reason of any fault or defect in the premises, nor for any loss or damage caused by any act, fault, neglect or omission of any tenant or occupant of the premises, and that the party of the first part should be permitted to enter upon the premises for the purpose of making repairs, if he should see fit to repair them, but that he should

not be obliged to repair them. Phelan was at the time of the accident in the occupation of the premises under the lease, and he was made a party defendant, but did not defend the action. Some time prior to July 29, 1881, Mrs. Steele commenced an action against her brother and sister for a partition of the real estate, including the pier held by them in common, and in that action on the day last-named, upon her petition, an order was made appointing Charles S. Brown receiver of the rents, issues and profits of the premises sought to be partitioned. On the 5th day of November, 1881, upon the petition of Mrs. Steele and her sister, Mrs. Hutton, an order was made by the Supreme Court in the partition action that the receiver reserve out of the receipts by him as such receiver, and set apart quarterly a sum that would amount to a yearly sum of $17,500, to be applied by him to the payment of the taxes, insurance, necessary repairs and other expenses, and that he should pay the remainder of such receipts quarterly to Mrs. Steele, Mrs. Hutton and to the committee of their lunatic brother.

Upon the trial it was shown that the pier was defective and out of repair at the time of the execution of the lease, on the 1st day of May, 1880, and that it remained defective and out of repair to the time of the accident. The counsel for the defendant asked the court to rule that they were not liable for the accident, because the pier came to them on the death of their mother, subject to a valid, outstanding lease, because it was the duty of the tenant to repair the pier, and it was not their duty to repair it without notice of its defective condition, and because the receiver had been appointed with directions to make the repairs necessary to the pier; and the court refused so to rule, and ruled, as matter of law that the defendants were responsible for the accident if the pier was out of repair at the time of the execution of the lease, and remained so to the time of the accident.

Further facts appear in the opinion.

*John B. Whiting* and *Charles A. Jackson* for appellants.
The motion to direct a verdict should have been granted,
as the defendants had not created the nuisance, had not
let or relet the premises, had no knowledge of the exist-
ence of the nuisance, and were not in possession of the
property. (*Rich* v. *Basterfield,* 4 C. B. 782, 804; *Gandy*
v. *Jubber,* 5 B. & S. 485; 33 L. J., Q. B. 151; 9 B. & S. 15;
*Chauntler* v. *Robinson,* 4 Exch. 168; Addison on Torts, 176;
Woodhall on Landl. and Ten. [13th ed.] 735; *Clancy* v.
*Byrne,* 56 N. Y. 129; *Wolf* v. *Kilpatrick,* 101 id. 146;
*Davenport* v. *Buckman,* 37 id. 152; *Woram* v. *Noble,* 41
Hun, 398; *Swords* v. *Edgar,* 59 N. Y. 28; *Edwards* v.
*N. Y. & H. R. R. Co.,* 98 id. 245.) The condition in the
lease permitting the landlord to enter and make repairs if he
saw fit to do so, did not impose any liability on him or his
successors to repair, and it was error in the court so to charge
the jury. (*Swords* v. *Edgar,* 59 N. Y. 37; *Roswell* v. *Pryor,*
12 Mod. 635.) The grantee or devisee of property, on which
there is an existing nuisance when he comes into the posses-
sion, can only be held after a request to abate. (*C. S. Road*
v. *R. R. Co.,* 51 N. Y. 573; *Waisman* v. *Greenbank,* Willes,
583; *Wenzlick* v. *McCotter,* 87 N. Y. 122, 127.) A receiver
being in control of the property at the time of the accident,
and having been authorized to set apart a fund to cover neces-
sary repairs, the owners were no longer liable. (*Weeks* v.
*Weeks,* 106 N. Y. 631; *Metz* v. *C. & P. R. R. Co.,* 58 id.
61, 66; Kerr on Receivers, 165.)

*Edward D. McCarthy* for respondent. A pier or bridge
which is open for public use is, *quasi,* a highway or street,
and subject to the same obligations. When allowed to go
dangerously out of repair, it becomes a nuisance. (*Radway*
v. *Briggs,* 37 N. Y. 258; *Heeney* v. *Heeney,* 2 Den. 625;
*Irvin* v. *Wood,* 4 Robt. 138; 51 N. Y. 224.) By the demise
of this pier, the trustee and legal owner, as well as the *cestui*
*que trust,* became liable. (*Swords* v. *Edgar,* 59 N. Y. 34;
*House* v. *Metcalf,* 27 Ct. 631; *Clancy* v. *Byrne,* 56 N. Y.

134; *Clifford* v. *Dam*, 81 id. 52; *Davenport* v. *Ruckman*, 37 id. 568; *Fish* v. *Dodge*, 4 Den. 4–11.) If the pier was a dangerous thoroughfare, open to public use, on the first day of May, 1880, its owners, legal and equitable, were responsible for it to the community at large and to individual sufferers. Of this responsibility they could not subsequently relieve themselves by any demise or alienation whatsoever. (*Rex* v. *Pedly*, 1 Ad. & El. 827; *Gandy* v. *Jubber*, 33 L. J., Q. B. 151; *Saxey* v. *Manchester Railway Co.*, 38 L. J., C. P. 154; *Owens* v. *Jones*, 9 Md. 108; *Pilsbury* v. *Moore*, 48 Me., 154; *Roswell* v. *Prior*, 12 Mod. 639; *Thompson* v. *Gibson*, 7 M. & W. 462; *Page* v. *Estey*, 54 Me. 319; *Wagner* v. *Germaine*, 3 Den. 306.) If the boy had lost his life an instant after Madame De Dion died, her successors, the reversioners, would have become liable to this plaintiff on the bare acceptance of the inheritance. (*Rex* v. *Pedly*, 1 Ad. & El. 827; *Rogers* v. *Stewart*, 5 Vt. 215; *Congreve* v. *Morgan*, 18 N. Y. 34; *Anderson* v. *Dickey*, 1 Robt. 244; *Creed* v. *Hartman*, 29 N. Y. 291; *People* v. *Erwin*, 4 Den. 129.) These reversioners and owners are liable for the additional reason that they upheld and maintained the nuisance by receiving rent therefor for nearly a year and a half before this cause of action arose. (*Fitz* v. *Hall*, 9 N. H. 441; *Prescott* v. *Norris*, 32 id. 103.) He who maintains and upholds a nuisance is just as guilty as he who has created it. (*Rex* v. *Pedly*, 1 Ad. & El. 827; *People* v. *Erwin*, 4 Den. 129.) Plaintiff's failure to charge the defendants with express notice of the existence of this nuisance did not relieve them of any liability for upholding it. (*Wenzlick* v. *McCotter*, 87 N Y. 122; *Irwin* v. *Wood*, 51 id. 288; *McCarthy* v. *City of Syracuse*, 46 id. 194.) The receiver was not a necessary party defendant. (*Mears* v. *Holbrook*, 20 Ohio St. 137; *Cowdrey* v. *R. R. Co.*, 1 Woods, 331; 27 Barb. 424; *Blunt* v. *Clitheroe*, 6 Ves. 799; *Atty.-Gen.* v. *Vigor*, 11 id. 563.) The alienation of the pier did not relieve Madame De Dion's trustee from responsibility. The defendants, her successors, stand precisely where she did. (*Rex* v. *Pedly*, 1 Ad. & El. 827; *Roswell* v. *Pryor*, 12 Mod. 639;

*Thompson* v. *Gibson,* 7 M. & W. 462; *Wagner* v. *Germaine,* 3 Denio, 306; *Anderson* v. *Dickey,* 1 Robt. 244; *People* v. *Erwin,* 4 Denio, 129.)

EARL, J. The will of John Gardner came under consideration in *Greason* v. *Keteltas* (17 N. Y. 491), and it was there held that the trustee under that will took an estate in fee determinable when the purpose of the trust should cease, and that such a trustee had power at law to lease for a term which might extend beyond the period of his trust estate. The lease executed by the trustee to Phelan for a term of five years from May 1, 1880, was, therefore, valid for the whole term, and had nearly four years to run at the time of Mrs. De Dion's death, and more than two years at the time of the accident. Hence any reasoning based upon the postulate that the defendants could have terminated the lease before the end of the term will lead to inevitable error.

There was no proof, even if that were in any way important, that the pier was out of repair in 1817, when Gardner died. It became out of repair and defective at some time during the existence of the trust estate, and in that condition it was demised by the trustee. By demising the pier while it was in such a condition as to be a nuisance, the trustee was guilty of a misfeasance, and during the existence of his estate, notwithstanding the lease, he would have been responsible for any damage caused by the nuisance. Even if he had been the trustee of Mrs. De Dion's children, and they had been the beneficiaries under the trust, they would not have been responsible for any nuisance created or permitted by him; and so it was held in *People* v. *Townsend* (3 Hill, 479). But he was not trustee for them; they derived no title or benefit from him, and had no connection whatever with him. They took their title under the will of John Gardner, and were in no way responsible for what the trustee did, or omitted to do, upon the trust estate.

We have, then, this question for our determination: Are the children of Mrs. De Dion, who became full owners of

this pier at the death of their mother, subject to a valid outstanding lease, responsible for a nuisance created thereon during the existence of the precedent estate, without any notice thereof? I have carefully examined the English and American authorities, and confidently assert that there is not an authority to be found in the books imposing such responsibility.

It is not the general rule that an owner of land is, as such, responsible for any nuisance thereon. It is the occupier, and he alone, to whom such responsibility generally and *prima facie* attaches. (*Pretty* v. *Bickmore*, L. R., 8 C. P. 401; *Kirby* v. *Boylston Market Assn.*, 14 Gray, 249; *City of Lowell* v. *Spaulding*, 4 Cush. 277; *Inhabitants of Oakham* v. *Holbrook*, 11 id. 299.) The owner is responsible if he creates a nuisance and maintains it; if he creates a nuisance and then demises the land with the nuisance thereon, although he is out of occupation; if the nuisance was erected on the land by a prior owner, or by a stranger, and he knowingly maintains it; if he has demised premises and covenanted to keep them in repair, and omits to repair, and thus they become a nuisance; if he demises premises to be used as a nuisance, or for a business, or in a way so that they will necessarily become a nuisance. In all such cases I believe there is now no dispute that the owner would be liable. But an owner who has demised premises for a term during which they become ruinous, and thus a nuisance, is not responsible for the nuisance unless he has covenanted to repair. It has even been held in some cases that an owner may demise premises so defective and out of repair as to be a nuisance, and if he binds his tenant to make the repairs he is not responsible for the nuisance during the term. (*Pretty* v. *Bickmore, supra;* *Gwinnell* v. *Eamer*, L. R., 10 C. P. 658; *Leonard* v. *Storer*, 115 Mass. 86.) But these cases are not in entire harmony with the decisions in our own state, and probably would not now be generally received as authority in this country or in England.

A grantee or devisee of premises, upon which there is a nuisance at the time the title passes, is not responsible for the nuisance until he has had notice thereof, and in some cases until he has been requested to abate the same. The authorities to this effect are so numerous and uniform that the rule which they establish ought no longer to be open to question. One of the earliest, if not the earliest case in which this rule was announced, is *Pennruddock's Case* (5 Coke, 100 b), where it was resolved that an action lies against one who erects a nuisance without any request made to abate it, but not against the feofee, unless he does not remove the nuisance after request; and in *Pierson* v. *Glean* (14 N. J. Law, 37), Chief Justice HORNBLOWER said: "The law, as settled in *Pennruddock's Case*, has never, I believe, been seriously questioned since." In *Plumer* v. *Harper* (3 N. H. 88), RICHARDSON, Ch. J., said: "When he who erects the nuisance conveys the land he does not transfer the liability to his grantee, for it is agreed in all the books that the grantee is not liable until upon request he refuses to remove the nuisance." In *Woodman* v. *Tufts* (9 N. H. 88) it was held that where a dam was erected, and land flowed by the grantor of an individual, the grantee will not be liable for damages in continuing the dam and flowing the land as before, except on notice of damages and request to remove the nuisance or withdraw the water. In *Eastman* v. *Company* (44 N. H. 144) it was held that no notice or request to abate the nuisance is necessary before bringing suit against the original wrong-doer in such cases for the damages done; but that the grantee of the nuisance is not liable to the party injured until, upon request made, he refuses to remove the nuisance. SARGENT, J., writing the opinion, said: "The doctrine of the cases in this state and elsewhere is that he who erects a nuisance does not by conveying the land to another transfer the liability for the erection to the grantee; and the grantee is not liable until upon request he refuses to remove the nuisance, for the reason that he cannot know until such request but the dam was rightfully erected; and there can be no injury in holding to this

doctrine, as the original wrong-doer continues liable notwithstanding his alienation." To the same effect is *Carleton* v. *Redington* (21 N. H. 291). In *Johnson* v. *Lewis* (13 Conn. 303), where it appeared, in an action for the obstruction of a water-course by raising a dam, that the dam creating the obstruction was erected by the defendant's grantor, it was held that the plaintiff could not recover without proving a special request to the defendant to remove the obstruction. SHERMAN, J., writing the opinion, said : " The law is well settled that a purchaser of the property on which a nuisance is erected is not liable for its continuance, unless he has been requested to remove it. This rule is very reasonable. The purchaser of property might be subject to great injustice if he were made responsible for consequences of which he was ignorant and for damages which he never intended to occasion. They are often such as cannot be easily known, except to the party injured ; " and so also it was held in *Noyes* v. *Stillman* (24 Conn. 15). In *Pillsbury* v. *Moore* (44 Me. 154), it was held that a purchaser of property, on which a nuisance is erected, is not liable for its continuance unless he has been requested to remove it. In *Pierson* v. *Glean* (*supra*), it was held that an action for continuing a nuisance cannot be maintained against him who did not erect it without a previous request to him to remove or abate it. In *Beavers* v. *Trimmer* (2 N. J. Law, 97), it was held that when the action is not brought against the original erector of a nuisance, but against a subsequent owner or tenant, a special request to remove it must be alleged. In *McDonough* v. *Gilman* (3 Allen, 264), it was held that a tenant for years is not liable for keeping a nuisance as it used to be before the commencement of his tenancy if he had not been requested to remove it or done any new act which of itself was a nuisance. And the same rule has repeatedly been laid down in this state. In *Hubbard* v. *Russell* (24 Barb. 404), an action against the continuator of a private nuisance originally erected by another to recover damages for the injury sustained thereby, it was held that the plaintiff must prove a notice to the defendant of its exist-

ence and a request to remove it. In *Miller* v. *Church*
(2 T. & C. 259), in an action to recover damages for the over-
flow of a mill pond, it was shown that the defendant, the
owner of the pond, was not in possession, having leased the
same to a third party, and it was held that the owner of
the premises overflowed could not recover for such overflow
without showing that the defendant had notice or knowledge
of the existence of the same before the action was brought.
And the same rules, without any variation, are laid down by
all the text writers.   In Chitty on Pleadings (71), it is said that
every occupier is liable for the continuance of a nuisance on
his own land, though erected by another, if he refuses to
remove the same after notice.   And in 2 Chitty on Pleadings
(333, note C), the author adds that if the action is not brought
against the original erector of the nuisance, but against his
feofee, lessee, etc., it is necessary to allege a special request to
the defendant to remove it.   In Cooley on Torts (611) the
learned author says : " A party who comes into possession of
land as grantee or lessee, with a nuisance already upon it, is
not in general liable for the continuance of the nuisance until
his attention has been called to it and he has been requested
to abate it."   In 1 Hilliard on Torts [3d ed.] 574) it is said :
" That a person who continues a nuisance erected by another
is liable therefor at the suit of any party damaged thereby if
he had knowledge of its hurtful tendency, or more especially
if notified or requested to remove it."   In Moak's Underhill
on Torts (253, 254, 255), the learned editor, with many cita-
tions of authorities to sustain him, says : " Where premises
are out of repair at the time they are leased in particulars
which the landlord is bound as against third persons not to
allow, the landlord is liable for any injuries sustained by a
third person from such want of repair.   But not even in such
case if the tenant's *use* is what produces the injury."
" A landlord who negligently or improperly constructs his
premises — as a dam — or where they become defective, after
notice suffers them to remain so, is liable to his tenant or a
stranger, who being himself free from fault, is injured

thereby." " Where a lessee or grantee continues a nuisance of a nature not especially unlawful, he is liable to an action for it only after notice to reform or abate it." In Addison on Torts [Wood's Am. ed.] § 240), it is said : " And so an action will lie against the landlord for a permanent nuisance, although the nuisance was created before the reversion came to him, *i. e.*, if he knew of it and might have determined the tenancy before the injury happened, as in the case of a tenancy from year to year." " If an action is brought against the originator of a nuisance, it is not necessary to demand the abatement or discontinuance of the nuisance before commencing the action, but if the action is brought against the mere continuance of a preceding nuisance, a request to remove the nuisance must be made before the action is commenced." (§ 280.) " The occupier of lands is in general responsible for the continuance of a nuisance upon them ; and so is the landlord if the nuisance existed at the time he demised them or created the tenancy after he had the power of determining it." (§ 283.)

According to these authorities the simple fact that the three children of Mrs. De Dion became owners of the pier upon the death of their mother, did not make them responsible for this nuisance then existing. Suppose this accident had happened an hour, or a day, or one week after the death of their mother, would they have been responsible, even if the pier had come to them not subject to any lease ? To cast such a responsibility upon a grantee or devisee might imperil his whole fortune. Before it can be cast in such a case, he must have notice of the nuisance and a reasonable time to abate it. There must be some fault, some *delictum* on his part, and his liability can have no other basis. The notice required to put him in fault may be proved like any other fact. The mere fact that the owner personally occupies the premises upon which the nuisance is alleged to exist is not always sufficient to charge him with notice of its existence. It may, like a dam, or a building obstructing ancient lights, be of such a nature that he may rightfully suppose that he has the right to maintain it ; or it may be of such a character that he may not know of its harmful tendency ;

in such cases he must have actual notice that the structure is a nuisance; and there may be cases in which, besides notice, there must be a request to abate. But where the structure or the condition of premises is such as to be absolutely a nuisance, plainly visible, so that an occupier may see and know the nuisance and its dangerous character or hurtful tendency, then an owner in the occupation of the premises may, from his mere occupancy, be charged with notice thereof. In this case if these defendants had gone into possession of this pier personally, or by their agents, its character was such that they must have known that it was dangerous and a nuisance, and no direct proof of notice would have been required to charge them; it could have been inferred. But when there is no proof that the owners of premises which came to them with a nuisance existing thereon without their fault, were ever in possession of the premises, or ever even saw them, there is no possible ground for charging them with notice or imputing to them legal fault.

But the position of these defendants is stronger than the one we have just been dealing with. This pier came to them, not only with this nuisance existing thereon, but subject to an outstanding lease for some years which they had no power to terminate. The lessee who occupied and used the pier was under obligation to the public to see that it did not become a nuisance, and it was his duty to respond for any damage sustained by any person from the nuisance. The owners of the reversion had the right, in the absence of notice, to suppose that he would discharge such duty and protect the public, and they were under no obligations to see by watchful vigilance that he performed such duty. And so it has been held in all the analogous cases, that the landlord, in the absence of notice, is liable only in case he demised the premises with the nuisance thereon. In *Rosewell* v. *Prior* (2 Salkeld, 460), a tenant for years erected a nuisance and afterwards made an under-lease, and the question was whether, after a recovery against the first tenant for years for the erection, an action would lie against him for the continuance

after he had made an under-lease? And it was held that it would, " for he transferred it with the original wrong, and his demise affirms the continuance of it." In *Todd* v. *Flight* (9 C. B. [N. S.] 377), it·was held that an action lies against the owner of premises who lets them to a tenant in a ruinous and dangerous condition, and who causes or permits them to remain so until by reason of the want of reparation they fall upon and injure the house of an adjoining owner. In *Nelson* v. *Liverpool Brewing Company* (L. R., 2 C. P. Div. 311), it was held that a landlord is liable for an injury to a stranger by the defective repair of demised premises only when he has contracted with the tenant to repair, or where he has been guilty of misfeasance, as, for instance, in letting the premises in a ruinous condition, and that in all other cases he is exempt from responsibility for accidents happening to strangers during the tenancy. LOPES, J., writing the opinion, said : " We think there are only two ways in which landlords or owners can be made liable in the case of injury to a stranger by the defective repairs of premises let to a tenant, the occupier, and the occupier alone, being *prima facie* liable — first in the case of a contract by the landlord to do repairs when the tenant can sue him for not repairing; secondly, in the case of a misfeasance by the landlord, as, for instance, where he lets the premises in a ruinous condition. In either of these cases we think an action would lie against the owner." In Woodfall's Landlord and Tenant ([13th ed.] 735), it is said : "As regards the liability of landlords to third persons, it may be taken as a general rule that the tenant, and not the landlord, is liable to third persons for any accident or injury occasioned to them by the premises being in a dangerous condition ; and the only exceptions to the rule appear to arise when the landlord has either (1) contracted with the tenant to repair ; or (2) where he has let the premises in a ruinous condition ; or (3) where he has expressly licensed the tenant to do acts amounting to a nuisance." In *Knauss* v. *Brua* (107 Penn. 85), repeated in *Fow* v. *Roberts* (108 id. 489), it is said : " We do not doubt but that in the absence of an agree-

ment to repair, the landlord is not liable to a third party for a nuisance resulting from dilapidation in the leasehold premises whilst in the possession of a tenant." In *City of Lowell* v. *Spaulding* (4 Cush. 277), SHAW, Ch. J., said: "By the common law, the occupier, and not the landlord, is bound, as between himself and the public, so far to keep buildings in repair that they may be safe for the public; and such occupier is *prima facie* liable to third · persons for damages arising from any defect. If, indeed, there be an express agreement between landlord and tenant that the former shall keep the premises in repair so that in case of a recovery against the tenant he would have his remedy over, then, to avoid circuity of action, the party injured by the defect and want of repair may have his action in the first instance against the landlord. But such express agreement must be distinctly proved." And to the same effect is *Lorne* v. *Farren Hotel Company* (116 Mass. 67). In *Cunningham* v. *Cambridge Savings Bank* (138 Mass. 480), MORTON, Ch. J., said: "It is often said in the cases that the occupier, and not the owner, of a building is liable to third persons· for damages arising from any defect. But by occupier is meant, not merely the person who physically occupies the building, but the person who occupies it as a tenant having the control of it, and being, as to the public, under the duty of keeping it in repair." In *Dalay* v. *Savage* (145 Mass. 38), land abutting on a public street in a city was sold under a power contained in a mortgage, and the owner of the equity of redemption released any title he might have to the purchaser, and was allowed by the purchaser to remain in possession under an agreement that he should pay rent at a certain rate monthly. At the time of the sale there was an open and visible defect in the cover of a coal hole in the sidewalk in front of a house on the land, which hole led to the cellar of the house. In consequence of this defect, during the tenancy, a person walking on the sidewalk fell into the hole, and it was held that he could maintain an action against the purchaser of the land for the injury thereby sustained. FIELD, J., writing the opinion said: "It seems to be settled

that if the landlord lets premises abutting upon a way which was from their condition or construction dangerous to persons lawfully using the way, he is liable to such persons for injuries suffered therefrom, although the premises are occupied by a tenant." " The reason of the rule that if a landlord lets premises in a condition which is dangerous to the public, or with a nuisance upon them, he is liable to strangers for injury suffered therefrom, is that by letting he has authorized the continuance of the nuisance," and the learned judge further said : " If the defendant had bought the premises subject to a lease to Breslin (the tenant), who had continued in occupation under it, a different case would have been presented ; " and he held the defendant responsible for the nuisance solely on the ground that he had demised the premises with the nuisance thereon. In *Nugent* v. *B. C. & M. Railroad Company* (80 Me. 62, 77), VIRGIN, J., writing the opinion said : " It is settled law that where the owner lets premises which are in a condition which is unsafe for the avowed purpose for which they are let, or with a nuisance upon them when let, and receives rent therefor, he is liable whether in or out of possession, for the injuries which result from their state of insecurity to persons lawfully upon them ; for by the letting for profit he authorized a continuance of the condition they were in when he let them, and is, therefore, guilty of misfeasance." In *Joyce* v. *Martin* (15 R. I. 558), A., owning a defective wharf used in connection with a public resort, and knowing the defect, leased the place and wharf to B., who learned of the wharf defect after accepting the lease, but continued to use the wharf and place for public resort ; and in an action for damages to C, who was injured by the wharf defect, it was held that the action was maintainable against both A and B jointly — against A solely on the ground that he knew the wharf was defective when he let it.

In *Owings* v. *Jones* (9 Md. 108) the plaintiff sued for damages for injuries by falling into a vault appurtenant to the property of the defendant, and built under a sidewalk of a public street.

It was shown in defense that the property had been leased by the defendant for the term of seven years, for an annual rent, and the court held that the defendant was not relieved from liability if the vault was so constructed as to be unsafe for passers-by when the premises were let, or as to be liable to become unsafe in the necessary opening for the purpose of cleaning it; and it laid down the following rules: (1.) When property is demised and at the time of the demise is not a a nuisance, and becomes so only by the act of the tenant while in his possession, and injury happens during such possession, the owner is not liable. (2.) But where the owner leases premises which are a nuisance, or must, in the nature of things, become so by their use, and receives rent, then, whether in or out of possession, he is liable for injuries received from such nuisance. In *Albert* v. *State* (66 Md. 325), the action was brought by a minor for damages sustained by him by the death of his parents, who were drowned by reason of the defectiveness of a wharf in the occupation of the defendant's tenant. The instruction given on the trial was that, "if the jury found that the defendant was the owner of the wharf and that he rented it out to a tenant, and that at the time of the renting the wharf was unsafe, and the defendant knew, or by the exercise of reasonable diligence could have known of its unsafe condition, and the accident happened in consequence of such condition, then the plaintiff was entitled to recover;" and this was, upon appeal, held to be a correct exposition of the law. In *Clancy* v. *Byrne* (56 N. Y. 129), the true rule was fully apprehended by FOLGER, J., who wrote the opinion. That was a case where plaintiff's horse fell through a defective pier, and the action was against a lessee who had covenanted with his landlord to make all ordinary repairs. The lessee had sublet the pier, and was not in the occupancy thereof, and it was held that if premises are in good repair when demised, but afterwards become ruinous and dangerous, the landlord is not responsible therefor either to the occupant or to the public during the continuance of the lease, unless he has expressly agreed to repair or has renewed

the lease after need of repair has shown itself; and that this rule applies to a lessee out of possession who has sublet to another who is in possession. The learned judge said: " Generally speaking, the person responsible for a nuisance is he who is in occupation of the premises on which it exists." "As between him who is landlord and owner and him who is the lessee and occupant of the premises, there is, in general, no obligation upon the former to keep them in repair where he has made no express contract to that effect." " Numerous authorities are cited. We have examined them all. It will be seen that in them the liability of the defendant is placed upon one of these grounds, viz.: That he owned or had rights in the premises, and leased them with the nuisance upon them; that he was in the possession of the premises and used them in their defective condition; that he was under a contract enforceable by plaintiff to keep the premises in repair and failed so to do; that he, in the first instance, created the nuisance and put it in the power of others to continue it; or that, being a municipal corporation, there was a duty upon it to repair. If there are authorities which, in the remarks of the court, reach farther than this, they will be found to go beyond the needs of the case in hand." In *Jaffe* v. *Harteau* (56 N. Y. 398), it was held that a lessor of buildings, in the absence of fraud or any agreement to that effect, is not liable to the lessee or others lawfully upon the premises for their condition, or that they are tenantable and may be safely and conveniently used for the purposes for which they are apparently intended. In *Swords* v. *Edgar* (59 N. Y. 28), the plaintiff's intestate was so injured by the falling of a defective pier that he died, and the action was brought to recover damages caused by his death. The defendant, the landlord, had rented the pier to a tenant who was in possession thereof at the time of the accident; and the defendant was held liable solely on the ground that he had demised the pier while the same was in a defective condition. In *Wenzlick* v. *McCotter* (87 N. Y. 122), it was held that where a person acquires title to land upon which is a nuisance, the mere omission to abate or remove it does not

render him liable; and that there must be something amounting to actual use, or a request to abate the nuisance must be shown. In *Edwards* v. *New York and Harlem Railroad Company* (98 N. Y. 247), it is said: "If a landlord lets premises and agrees to keep them in repair, and he fails to do so, in consequence of which any one lawfully upon the premises suffers injury, he is responsible for his own negligence to the party injured. If he demises premises knowing that they are dangerous and unfit for the use for which they are used, and fails to disclose their condition, he is guilty of negligence which will in many cases impose responsibility upon him. If he creates a nuisance upon his premises, and then demises them, he remains liable for the consequences of the nuisance as the creator thereof, and his tenant is also liable for the continuance of the same nuisance. But when the landlord has created no nuisance and is guilty of no willful wrong or fraud or culpable negligence, no case can be found imposing any liability upon him for any injury suffered by any person occupying or going upon the premises during the term of the demise; and there is no distinction stated in any authority between cases of a demise of dwelling-houses and of buildings to be used for public purposes. The responsibility of the landlord is the same in all cases. If guilty of negligence or other *delictum* which leads directly to the accident or wrong complained of, he is liable; if not so guilty, no liability attaches to him." *Wolf* v. *Kilpatrick* (101 N. Y. 146), is an instructive case. There the defendants were owners of certain premises in the city of New York, which they leased to M., who, under and in accordance with a permit from the city, built vaults under the sidewalk in front thereof, with a coal hole, which was properly constructed, and in the usual and permitted manner. Through the wrongful act of a stranger, who broke the stone supporting the iron cover of the coal-hole, the cover turned when the plaintiff stepped upon it, and he fell and was injured. In an action to recover damages, it did not appear that the defendants had any knowledge or notice of the defect, and it was held that they were not liable;

that they would not have been liable had they themselves constructed the vaults lawfully and with due prudence and care, and thereafter transferred possession of the premises to a third person without covenant on their part to repair; that if the coal-hole became a nuisance after the stone was broken, only the person who created the nuisance, or he who suffered it to continue, was responsible; that a party out of possession and control and who had no knowledge, actual or constructive, of the defect, could not be said to have suffered it to continue; that a landlord out of possession is not responsible for an after occurring nuisance unless, in some manner, he is in fault for its construction or continuance, and that the bare ownership will not produce this result. FINCH, J., said: "How can it be said that they (the defendants) suffered it (the nuisance) to continue and so failed in their duty if they had no knowledge, actual or constructive, of the defect, and were out of possession and control?" "It is quite certain that the plaintiff in this case was bound to establish some fault of omission or commission on the part of the landlord tending to the injury, and barely showing him to be the owner is not enough. There was no fault of commission. There could be no fault of omission unless the landlord was bound to repair the defect, had actual or constructive notice of its existence, or was bound at his peril to discover and to remove it." In *Walsh* v. *Mead* (8 Hun, 387), DANIELS, J., said: "The erection and maintenance of a nuisance is a wrong, and by leasing the building affected by it to another person, the owner continues it, and stipulates for the enjoyment of the profit from it." In 1 Thompson on Negligence (317), the learned author has concisely stated the law of nuisance in harmony with all these cases.

Now, within these authorities, what ground is there for imposing liability upon these defendants for this nuisance? They did not create it, and had no connection whatever with those who did create it. They were not bound by the lease to repair the pier. They did not demise the pier with the nuisance thereon, and they had no notice, actual or presump-

tive, of the existence of the nuisance. None of the grounds of liability exist which are mentioned by Judge FOLGER in *Clancy* v. *Byrne*. They were simply entitled to the rent; it is not even proved that they actually received any. But it has never been held in any case that the receipt of rent imposes responsibility upon a landlord for a nuisance for which he is not otherwise responsible. Landlords always are entitled to rent; and if the mere receipt of rent would make them responsible for a nuisance upon the demised premises, then they would always be responsible, irrespective of other circumstances which have always been deemed necessary to create the responsibility.

The fact that the defendants, under the lease, had the right to go upon the pier and make repairs, if they should see fit to do so, is wholly immaterial in this case. Even when an owner demises premises and covenants to repair, the covenant cannot enure directly to the benefit of a third person not a party thereto. But in such case the third person injured because, for want of repairs, the demised premises have become a nuisance, has a cause of action primarily against the tenant. But because the tenant in case of a recovery against him could sue his landlord for indemnity upon the covenant, to prevent circuity of action, the person injured may bring his action against the landlord, not because the landlord owed him any duty to repair, but because he owed that duty to his tenant. It would have been wholly immaterial if these defendants, owners of the pier, had let it without reserving any right to go upon it for repairs, and even if they could not have gone upon it for repairs without being trespassers. (*Fish* v. *Dodge*, 4 Denio, 311; *Swords* v. *Edgar*, *supra*.) There is no case which holds that whether the landlord can or cannot go upon the demised premises to make repairs is a material circumstance affecting his liability for a nuisance existing thereon. It was held in *Clancy* v. *Byrne* (*supra*), that a lessee who has covenanted with his landlord to repair is not responsible to a stranger for a nuisance upon the demised premises while in the possession of a sub-tenant to

whom he had let them.    As he had made no covenant to repair
with his tenant, and was not bound to indemnify him, the
person injured could not maintain an action against him,
although he had covenanted with his landlord to repair.
Here, according to the law of that case, if these owners had
even been under a covenant with their predecessors in the
title or with any other person but Phelan, to keep this pier in
repair, their breach of the covenant and failure to discharge
their duty to their covenantee would not have made them
liable for the death of the child; and with much less reason
can such a liability spring from a mere stipulation in a lease
made by one for whose acts they are in no way responsible
which merely put it in their power to make the repairs.    In
cases where it is said that a landlord bound to make repairs
upon demised premises is responsible for a nuisance thereon,
the obligation to make the repairs was one existing between
him and the tenant.    (*Russell* v. *Shenton*, 2 Gale & D., 573.)
The whole argument on this point is summed up in the state-
ment that, as there was here no breach by the defendants of
any duty due from them to the tenant, the stipulations in the
lease do not concern a stranger thereto.

There is no authority from the reported decisions or from
the text books which imposes upon the landlord, not other-
wise liable for a nuisance upon demised premises, the duty of
active vigilance to ascertain their condition.    A landlord has
never been held responsible for a nuisance because he did not
himself obtain notice of its existence.    But it has always
been held to be the duty of any person seeking to enforce the
landlord's responsibility for a nuisance to show that he had
such notice.

There are two cases to which I have not yet referred, which
are so like this in all material particulars that they ought to
be received as conclusive authority for the defense of this
action.    In *Woram* v. *Noble* (41 Hun, 398), a case entirely
similar to this, the action was brought to recover damages for
an injury sustained in consequence of a defective coal-hole;
and it appeared that the defendant became the owner of the

premises in September, 1883, subject to a lease to a tenant expiring May 1, 1884, which required the tenant to make all repairs; that the coal-hole was then in the sidewalk, but it had not been constructed by the defendant, nor did he have any notice or knowledge of its defective condition, although the tenant had noticed the depression in the stone about a year previous to the accident; and it was held that the defendant could not, in the absence of any evidence to show that he was responsible for the condition of the coal-hole or had knowledge of its defective condition, be held liable for the injury sustained by the plaintiff. The judge writing the opinion said: "We find no special decision and no principle enunciated in any elementary work that will furnish a basis for a recovery against the defendant in this action. He did not construct the work that became a nuisance, and he did not continue it in any legal sense." There, as here, the defendant became the owner subject to a lease, and the nuisance existed at the time he became such owner, and it was held that he could not be made liable for the accident without proof of notice to him of the existence of the nuisance. In *Conhocton Stone Road* v. *Buffalo, New York and Erie Railroad Company* (51 N. Y. 573), the action was brought to recover damages for injuries to the plaintiff's road-bed, caused by the same being washed and flooded in the years 1864 and 1865, by reason of an embankment and bridge built over a creek by a prior owner of defendant's road in 1851 or 1852. The defendant became the owner of the embankment, bridge and of its road by purchase at a foreclosure sale in 1857, and in February, 1863, it leased its road, including the embankment and bridge, to the Erie Railroad Company, which took possession of the road and had possession under its lease at the time of the damage complained of by the plaintiff; and the general rule was affirmed that in order to maintain an action for damages resulting from a nuisance upon defendant's land where such nuisance was erected by a prior owner before conveyance to defendant, it is necessary to show that before the commence-

ment of the action he had notice or knowledge of the exist-
ence of the nuisance, but that it is not necessary to prove a
request to abate it.   Judge LOTT, writing the opinion, said:
"Where persons succeeding to the ownership of land on
which a nuisance had previously been erected have been held
liable for damages resulting from its subsequent continuance,
it appeared either that it was after notice of its existence or
that the question of such notice had not been raised at the
trial."   That case is a most emphatic authority for the
defendants here.   There the defendant became the owner of
the premises with the nuisance existing thereon, and actually
leased them in the same condition to another company which
was in possession at the time of the damage complained
of, and yet, in the absence of proof that the defendant had
notice of the nuisance, it was held not to be liable for damages
caused thereby.

It is frequently said that a landlord who has demised prem-
ises with a nuisance thereon, continues liable for the nuisance,
although he did not create it, because it was a misfeasance to
demise them in that condition.   But it will be found that all,
or nearly all, the cases in which this has been said are cases in
which, at the time of the demise, the landlord had notice of
the nuisance.   In the case last cited the defendant demised the
premises with the nuisance thereon, and yet it was held not
to be liable because there was no proof of notice.

I will now notice the principal cases which are supposed to
be in conflict with some of the views I have expressed and
with the conclusion I have reached.   In *Brown* v. *Cayuga
and Susquehanna Railroad Company* (12 N. Y. 486)
the predecessor of the defendant had constructed its road
across a stream of water in such a manner as to cause the
stream to overflow and damage the lands of the plaintiff.
Upon the trial the defendant insisted that, inasmuch as it had
no agency in building the obstruction in the stream or in
making the excavation through the bank, but that had been
done by the old company, it was not liable, and upon this

ground it moved for a nonsuit, which was denied. Upon the appeal it was held that the defendant could not have the benefit of the point that there had been no request to abate the nuisance because it was in no way taken at the trial, and hence the case was treated as if the request had actually been made and proven. The point decided, as stated in the head note, is that "the successor to the title and possession of property who omits to abate a nuisance erected thereon by another, after notice to do so, is liable for the damage caused by its continuance." Judge DENIO, writing one of the opinions, held that an action on the case will lie against one who continues a nuisance by which damage is occasioned to the plaintiff without notice first given to remove it. He cited no authority sustaining his views, but cited authorities in conflict with them, holding that they were not binding upon the court. But it is expressly stated that the court did not pass upon the question whether the defendant was liable, without notice, to remove the obstruction and restore the bank of the stream; and the views of Judge DENIO, besides having the support of no authority in this country or England, were distictly repudiated in *Conhocton Stone Road* v. *Buffalo, New York & Erie Railroad Company* (*supra*). In *McCarthy* v. *Syracuse* (46 N. Y. 194) damage was caused by a defective city sewer which it was the duty of the city to keep in repair, and it was held liable for the damage without notice of the defect in the sewer, because it had omitted to discharge that duty. That case bears no analogy to this. In *Irvine* v. *Wood* (51 N. Y. 224) the action was against lessor and lessee to recover for injuries sustained by the plaintiff from a defective coal-hole in the street. The plaintiff recovered against both defendants and both appealed, but the lessor abandoned his appeal, and the case was argued only on behalf of the lessee who had maintained and used the coal-hole in its defective condition, and it was held that he was liable. The main litigation at the trial was as to the liability of the lessee which rested upon plain principles of law, and the case is authority only as to such liability. No point or claim was made at the trial that

the landlord had no notice of the defective condition of the coal-hole, or that he could be made liable for the accident only upon proof of such notice, and no such point was before the court upon the appeal. In *Swords* v. *Edgar* (*supra*), as stated above, the action was against the landlord, who demised the pier when it was in a defective and dangerous condition, and the case is a valuable authority for the views I have expressed. In *Beck* v. *Carter* (68 N. Y. 283) and *Clifford* v. *Dam* (81 id. 52), the actions were in each case against the defendant, who had himself created the nuisance. While in *Bellows* v. *Sackett* (15 Barb. 96) some things were said by the judge writing the opinion which are not now the law, the case was properly decided, because there the defendant, the landlord, erected the nuisance and demised the premises with the nuisance thereon. *Rex* v. *Pedly* (1 Ad. & El. 822) is much relied upon by the plaintiff as an authority in his favor. There the defendant purchased premises which were in the occupancy of tenants under a demise for short periods of time from the prior owner, and a nuisance arose thereon after the purchase and after the defendant began to receive the rents. The defendant, the periods being short, was treated as having relet the premises to the tenants with the nuisance thereon, and it was held that he thereby became liable for the nuisance; and upon that ground the decision can stand in harmony with all the cases I have cited. But the court seems to have gone further and affirmed a proposition, not necessary for the decision, that such a reversioner is liable to be indicted for the continuing of the nuisance, if the original reversioner would have been liable, though the purchaser has had no opportunity of putting an end to the tenant's interest or abating the nuisance. That proposition is unsound; and as to that the case has been overruled and distinctly repudiated in England. In *Rich* v. *Basterfield* (C. B. Rep. 784), the case of *Rex* v. *Pedly* was largely criticised, and CRESWELL, J., writing the opinion, said of it that "if *King* v. *Pedly* is to be considered as a case in which the defendant was held, because he had demised the buildings where the nuisance existed, or

because he had relet them after the user of the buildings had created the nuisance, or because he had undertaken the cleansing, and had not performed it, we think the judgment right and that it does not militate against our present decision. But if it is to be taken as a decision that a landlord is responsible for the act of his tenant in creating a nuisance by the manner in which he uses the premises demised, we think it goes beyond the principles to be found in any previously decided cases and we cannot assent to it." In *Todd* v. *Flight* (*supra*) *Rex* v. *Pedly* was cited as holding that if the defendant demised the privy either when it had become a nuisance, or if he had the duty of cleansing it after it became a nuisance, he might be indicted for the nuisance. In *Russell* v. *Shenton* (*supra*) it was said by Lord Ch. J. DENMON, in reference to *Rex* v. *Pedly*, that "it was an indictment against the owners of houses and privies which had been built for the very purpose of being so used as to create a nuisance unless the owner took effectual means to prevent it. These means not having been adopted, the owner who received rents for both was held liable for the public nuisance." In the case of *Gandy* v. *Jubber* (5 B. & S. 76) the owner of premises, attached to which was an area, let the same to a tenant from year to year and died, having devised the property, with an iron grating over the area improperly constructed and out of repair so as to amount to a nuisance, to the defendant, who having no notice of the nuisance suffered the tenant to remain in occupation of the premises upon the same terms as before, receiving rent; and it was held that he was liable for damage caused by the nuisance on the ground that he had relet the premises with the nuisance thereon. That case is in no way an authority for the plaintiff, but by implication the point decided strongly favors the contention of the defendants. It is clear that the court was of the opinion that the defendant would not have been liable but for the fact that he had let the premises with the nuisance thereon. That case went by appeal to the Exchequer Chamber, and is again reported in the same volume, at page 485; and it was there strenuously contended

on behalf of the defendant that he was not liable because he could not be treated as having demised the premises with the nuisance thereon, and because he had no notice of the nuisance. The court took the case under consideration and finally recommended the plaintiff to accept a *stet processus* — substantially a final stay of proceedings — and the plaintiff accepted it, evidently induced so to do because of information that the judgment would go against him. In the course of the argument in the Exchequer Chamber, Chief Justice ERLE said of the landlord's liability: "If he lets the premises with a nuisance, all parties agree that he is responsible." The reasons why the Exchequer Chamber recommended that the plaintiff should accept a *stet processus* do not appear in the report. But in 9 Best & Smith (15), there is what purports to be the undelivered opinion of the court in that case, showing that the court had unanimously come to the conclusion to reverse the judgment of the Queen's Bench; and in the opinion the case of *Rex. v. Pedly* was again criticised, explained and limited as in prior cases. One question in the case was, whether a landlord, who has the power to determine a tenancy from year to year by giving notice, and who does not exercise it, is to be held as thereby reletting the premises. In the opinion, published in 9 Best & Smith, the ground on which the Exchequer Chamber differed from that of the Queen's Bench distinctly appears as follows: "We agree that, to bring liability home to the owner, the premises being let, the nuisance must be one which was, in its very essence and nature, a nuisance at the time of the letting, and not something which was capable of being thereafter rendered a nuisance by the tenant, and that it is a sound principle of law that the owner of property receiving rent should be liable for a nuisance existing on his premises at the date of the demise; but that wherein we differ is, that a landlord, from year to year, having the power to give the ordinary notice to quit, and not giving it, is thereby to be held as reletting the premises, and that such failing to give notice is equivalent to a reletting." That case, then, is an authority that, upon such

facts as we have here, devisees of premises under a lease for a term with no power in the devisees to terminate the lease during the term, such devisees are not liable, although they received rent, for a nuisance which they did not cause, create or authorize. In *Salmon* v. *Bensley* (Ry. & M. 189) a *nisi prius* case of very doubtful authority, it was held that a notice to remove the nuisance left at the premises is evidence against a subsequent occupier. That case has no bearing upon this because the defendants were not subsequent occupiers; they never occupied, and did not continue the nuisance. The pier remained in the occupancy of Phelan. Besides, there is no question of notice in this case, as the court held, as matter of law, that the defendants were responsible if the nuisance existed at the time of the demise to Phelan. In Wood's Landlord and Tenant (618), the author says: " When a nuisance results from such want of repair, and there is no covenant to repair on the part of either landlord or tenant, an action may be maintained against either of them therefor." But he was speaking of repairs which the landlord was bound by some law to make. But there is no general law and no rule of law which imposes upon the landlord the duty to make repairs upon premises in the occupancy of his tenant. At page 917 the learned author states the proper rule in harmony with all I have said. There he says: " The landlord's right of possession being suspended during the term, it follows that his liabilities in respect to the possession are also suspended in respect to such matters or defects in the premises as existed when the premises were let arising from the manner of use or defective construction. If a nuisance existed upon the premises at the time of the demise, the landlord as well as the tenant is liable for the damages resulting therefrom, although it only becomes a nuisance by the act of the tenant in using it for ordinary purposes. And if the tenant creates a nuisance upon the premises during the term by an unusual or extraordinary use thereof, although the landlord cannot be made chargeable for the consequences in the first instance, yet if he subsequently renews the lease with the nuisance thereon, he becomes

chargeable therefor the same as though the nuisance had existed at the time of the original demise; and when a person is in possession as a tenant from year to year, each year is treated as a reletting, so that the landlord becomes chargeable for a nuisance created by the tenant during a previous year which is in existence at the commencement of the new year;" and there is more to the same effect, as there is also in Wood's Law of Nuisance (78, 141).

If Phelan had been the mere servant or agent of the defendants, and had caused or permitted this or any other nuisance upon the pier, then the defendants would have been responsible for it, and the cases of *Clark* v. *Fry* (8 Ohio St. 358) and *Ellis* v. *Sheffield Gas Company* (2 Ellis & Black. 767) would have been in point.

It is said that many of the cases I have cited were nuisances created by damming, obstructing, polluting and diverting streams, and that they are not, therefore, applicable. Why are they not applicable? They were all decided by the application of the general law of nuisance, and it has never been suggested in any case that there is any law of nuisance peculiar to such cases, and that they are not to be governed by the same rules that apply to other nuisances. They announce general rules in terms applicable to all cases of nuisance.

If it is at all material, it is a mistake to assume that the children of Mrs. De Dion first became owners of this pier upon the death of their mother. Under the will of their grandfather, John Gardner, they had vested remainders therein long before the death of their mother, and long before the pier was out of repair. They took no new title upon the death of their mother. The estate which was before in them was simply enlarged by the disappearance of the precedent estate. Were they bound in some way to divest themselves of the estate which they had long had in order to escape responsibility for a nuisance which they had not created or authorized? Or, if they did not or could not do that, were they bound to go upon the pier and possibly expend in repairs

more than the entire income therefrom to escape responsibility for the nuisance? And were they bound to do this at the peril of great damages, without notice of the nuisance, while the pier was in the possession of a tenant who had hired it from a stranger to them at a small rent, because it was out of repair, and who was under a duty to the public to keep it safe and in repair? If the children of Mrs. De Dion had, upon the death of their mother, demised this pier without any covenant to repair, and it had become out of repair and a nuisance during the term of the demise, they would not have been responsible for the nuisance; and why should a greater responsibility be cast upon them because the pier came to them subject to the demise? What have they done to incur the responsibility? If they had demised the pier knowing it was out of repair, they would have been guilty of continuing the nuisance, and upon that ground would have been responsible for it. But they have done nothing. They neither created, authorized or continued the nuisance, and they were not bound by contract or the law to discharge a duty which rested upon the tenant.

I am confident that a holding that the defendants are liable to the plaintiffs for the consequences of this nuisance would be a departure from the law of nuisance as universally approved in the books.

I have not thus far alluded to the claim of the defendants, that they may find protection in the fact that a receiver had been appointed of the rents. It is not necessary to determine whether that fact furnishes them an independent defense. The pier and other property came to them as tenants in common. One was a lunatic, and a partition on that account became important, if not necessary. An action was commenced by one tenant in common against the other two, and a receiver was appointed to take the rents which accrued after the death of their mother. The receiver thus appointed was not their agent. If he had created any nuisance or done any other wrong, they would not have been responsible for it. He was the agent and officer of the court, bound to obey its

directions, and subject to its control.    It ordered him to take and retain sufficient of the rents, otherwise payable to the defendants, to make necessary repairs.    Under such circumstances, with a tenant bound to make the repairs, and a receiver also bound to make them, could the owners, one a lunatic and the other two residing in Europe, without any notice of the nuisance, be charged with any responsibility therefor on the theory of fault or *delictum* on their part?

The principles here involved are very important, and I have deemed a pretty thorough examination of this case quite proper.    My conclusion is that this action, upon the facts now appearing, cannot be maintained, and that the judgment should be reversed and a new trial granted.

DANFORTH, J. (dissenting). I cannot concur in the judgment about to be pronounced in this case.    It appears that on the 8th of October, 1882, the plaintiff's intestate, while lawfully upon the easterly half of the pier or wharf known as No. 54, in the city of New York, fell through its flooring into the East river and was drowned.    The plaintiff, as administrator, brought this action for damages to the next of kin on account of his death.    Issue was joined by the defendants and brought to trial before a jury.    At the close of the plaintiff's case it was made clear, from admissions in the answer, that the defendants were owners of that part of the pier where the accident happened, and by evidence that it was in a defective condition in 1879, and thenceforward until it gave way ; and the jury also found, upon sufficient evidence, that the intestate did not, by any negligence on his part, contribute to the injury.    Upon that state of the case the defendants were clearly liable upon the principle of the maxim: "*Sic utere tuo ut alienum non lædas.*"    There was no error, therefore, in denying their motion for a dismissal of the complaint, and the exception thereto was without merit.

It is claimed, however, by the appellants that their relation to the property was so controlled by circumstances afterwards

disclosed by way of defense, as to relieve them from liability. At the close of the plaintiff's case the defendants went into evidence, and not controverting the ownership of the pier, its condition, or the plaintiff's injury, they showed that James Gardner, being the former owner of the pier, devised it with other property in fee to certain persons in trust that they should, during the lives of the testator's children, "in the first place, out of the rents, issues and profits thereof," uphold, support, amend and repair "the same with all needful and necessary amendments, repairs and alterations, and, next, distribute the residue among his children, and, after their death, among their issue, to whom was also devised in fee the remainder;" that the estate was subsequently divided, and the pier in question, among other pieces of real estate, "fell to Jane, the testator's daughter, and her issue, viz. : Mrs. Hutton and Mrs. Steele, the defendants herein. The original trustees having died, McCarty was appointed by the court trustee in their place, of that portion of the property which fell to Jane and her heirs, and he, as such trustee, on the 1st of May, 1880, executed to one Phelan a lease for that part of the pier already referred to, for the term of five years, at an annual rent of $750 for three years and $850 for the other two years, but reserving to "the party of the first part (the lessor), or his agent, the right to enter the premises for the purpose of making repairs, if he should see fit to make them." "But," it continued, "the party of the first part shall not be obliged to repair the premises," and by its terms the lessor was to be exempt from all liability to the tenant by reason of their non-repair, either then or in the future, and no obligation was imposed upon the tenant to keep them in order or in repair. McCarty continued to act as trustee until the death of Jane, the surviving daughter of the testator, which took place May 22, 1881, whereupon suit was at once commenced by Mrs. Steele for partition of the premises which had been set apart to her mother and her issue, and in that action an order was made July 29, 1881, by which one Brown was appointed receiver " of the rents, issues and profits that have accrued

since May 1, 1881, of the lands and premises described in the complaint in that action and which were set apart to Jane De Dion, deceased, in severalty and her issue." Upon these facts, the learned counsel asked the court to direct a verdict for the defendants on the grounds:

*First.* "Because this property was leased by Thomas McCarty, trustee, on the first day of May, 1880, for five years, and that the trustee then held the legal title to the property; that Jane De Dion, the life tenant, was living until May, 1881, a year and one month after the lease was made, and the defendant owners took the pier at that time, subject to the lease, and at no time have had any notice of the defective condition of the pier.

*Second.* "That the defendant owners cannot be charged with the condition of the pier at the time of the accident, because at that time it was leased to the defendant Phelan, and it was his duty to repair it; and in the absence of notice of the defective condition of the pier to the defendant owners the duty to repair, on their part, never arose."

*Third.* "Because the defendant owners did not become owners of the pier until after the death of the life-tenant in May, 1881, and took it at that time, subject to a lease to run for five years from May 1, 1880, to May 1, 1885, and there is no proof in the case that they had any knowledge or notice of the defective condition of the pier."

The motion was denied. The defendants then called Brown, the receiver, and proved that he had acted as such as to the rents until June, 1887; that at the time of his appointment, and for some time after, McCarty was insane; that Mrs. Hutton resided in France and Mrs. Steele in England; that Phelan occupied the full term of his lease. They also proved an order of the court made on the 5th of November, 1881, upon the petition of Mrs. Steele and Mrs. Hutton, by which the receiver was directed to reserve out of the receipts by him as such receiver, and set apart quarterly and each and every quarter a specified sum "to be applied by him to the payment of the taxes, insurance, necessary repairs, Croton water tax

and other incidental necessary expenses, commissions, etc.
And that he pay the remainder of such receipts each and
every quarter, as the same shall accrue, to Rosalie M. Steele,
or her attorney in fact, and to Henrietta Hutton, or her
attorney in fact, and Fanny McCarty, as committee for
Thomas McCarty, in equal proportions."

It was then proven by defendants that on the 4th of Octo-
ber, 1884, the plaintiff in this case applied to the court for
leave to sue Brown, the receiver, upon the cause set out in
the complaint in this action, and that the motion was denied.
The defendant's counsel thereupon renewed his motion that
the court direct a verdict for the defendant on the further
ground that " at the time the accident happened there was a
receiver in control of the property, appointed by the court,
collecting the rents, issues and profits, and that under the
order of the court he had been directed to make necessary
repairs to the premises." The learned trial judge declined to
do so, and his rulings have been sustained by the General
Term. I agree with that court in the conclusion that no
error was committed by the trial judge.

It is obvious that the supposed exemption from liability, so
far as the condition of the premises and the relations created
by the devise and lease are concerned, was at the trial put by
the defendants' counsel upon the absence of notice to the
defendants of the defective condition of the pier. The lack
of that notice or knowledge form the ground of the first
three propositions submitted to the trial judge, and that point
is now presented with great earnestness in support of this
appeal. The validity of the lease is assumed by both parties.
It derives its efficacy from the devisor (*Greason* v. *Keteltas*,
17 N. Y. 491), and as he created the power to execute, the
lease must be construed as emanating from him; it would
otherwise be without force or authority. In contemplation
of law, therefore, so far as the lease follows the power, the
devisor is to be regarded as the lessor and the estate of the
lessee as having precedence over other estates or interests
created by the testator (*Isherwood* v. *Oldknow*, 3 Maule & S.

382), and the rent payable to the trustee so long as his estate continued, and after that to such other person as by the terms of the will should be entitled to it, viz., issue of the children of the testator, and they are the defendants in this action.

The will of Gardner, as we have seen, makes it the duty of the trustees mentioned in it to keep the premises in repair and, as the first object of the trust required them, to apply all the rents and profits if needful to that purpose. This duty devolved upon McCarty as their successor. If we assume that he could shift that duty to another, he has not done so. If from the mere act of leasing such effect could be implied, it could only be where the right to the possession of the premises had been wholly transferred to the tenant, so that an entry by the lessor or landlord would be a trespass. The lease in this case has not that effect; the right of entry, and so the right to the possession of the pier for the purpose of repairs, never passed from the lessor, and the reservation is as broad as the duty imposed by the will. It is true it is to enter if the lessor shall see fit to make repairs but it must be deemed that he intended such repairs, as the will directed, and to have in view those indicated by the testator, viz., "all necessary repairs." The reservation shows that the lessor deemed himself bound to provide for them, and that he intended to do so. Such is the effect of the provision in the lease, and it, moreover, must be read as if it incorporated the directions of the will in regard to the duty of the trustee in respect to repairs. The lessor, therefore, could not avail himself of the principle which requires the tenant, and not the landlord, to make the demised structure safe for the traveler. The right to enter included the right of supervision and inspection, and, indeed, the entire control of the premises, so far as was necessary to enable him to make all necessary repairs. (*Kirby* v. *Boylston Market Association*, 14 Gray, 250.) If the accident had occurred while the trustee's estate continued, he would have been liable, not only because the leased premises were defective when the lease was executed and the responsibility incurred as matter of law, but because he was himself bound to the duty

of reparation. During that period of time these defendants would not have been liable, for they had neither the title to the property, nor its possession, nor in any capacity control over it. Their condition was like that of the defendant in *People* v. *Townsend* (3 Hill, 480). They were not responsible for the condition of the pier nor connected with its possession, for they had no estate nor interest in the land and could only enforce the execution of the trust. The trustee, on the other hand, so long as he held that office, had the title and the whole estate, subject only to the execution of the trust; and if from the condition of the property a third person was injured, it was his fault and his the responsibility. The legal estate of the trustee, however, was in him so long only as the execution of the trust required, and it then vested in the persons beneficially entitled. (1 R. S. 728, §§ 61, 62.) This occurred upon the death of the defendant's mother, and it is expressly averred by the defendants that they " then became, as owners in fee, entitled to the rents, issues and profits of the " premises in question under the lease made by the trustee. By thus accepting the estate under the devise the defendants took the place of the lessor, assumed the duty of caring for the property, and, unless the case is exceptional, in suffering it to remain in a dangerous condition they came short of their obligation, and actual notice was not material or necessary to enable the plaintiff to maintain his action. As soon as the defendants acquired the right to the possession of the pier, or to the rents, they were bound to know its condition and at once guard against the danger to which the public had been before exposed, and became liable for the consequences of having neglected to do so in the same manner as if they themselves had originated the lease and the nuisance. They were able at any time to gain possession of the premises for the purpose of repair, and this enabled them to abate the nuisance. In such a case the landlord is not exempt from liability. (*Coupland* v. *Hardingham*, 3 Camp. 398; *Irwin* v. *Sprigg*, 6 Gill. 200.)

A variety of cases have been referred to by the appellants,

or brought to our attention during the consideration of this appeal, which, it is claimed, hold a different doctrine. They have no application to the facts on which the defendants are chargeable. The cases thus cited relate principally to the obstruction of private ways, or the diversion of water-courses, viz.: *Beavers* v. *Trimmer* (25 N. J. Law, 97); *Pierson* v. *Glean* (14 id. 36); *Johnson* v. *Lewis* (13 Conn. 303); *Noyes* v. *Stillman* (24 id. 15); *Woodman* v. *Tufts* (9 N. H. 88); *Carleton* v. *Redington* (21 id. 291); *Snow* v. *Cowles* (26 id. 275); *McDonough* v. *Gilman* (3 Allen, 264); *Inhabitants of Oakham* v. *Holbrook* (11 Cush. 299); *People* v. *Townsend* (3 Hill, 479); *Hubbard* v. *Russell* (24 Barb. 404); *Conhocton Stone Road* v. *Railroad Company* (51 N. Y. 573). In all of them, except *McDonough* v. *Gilman,* the structure complained of caused water to overflow and injure the plaintiff's land, and it was held that an action for continuing a nuisance could not be maintained against one who did not erect it, without showing that he had notice or knowledge of the existence of the nuisance. In most of these cases the court cite and put the decision upon *Penruddock's Case* (5 Coke, 1a 101.) And in more than one the rule there laid down is held to be reasonable, "because otherwise the purchaser of property on which the structure is erected might be subjected to great injustice if he were made responsible for consequences of which he was ignorant, and for damages which he never intended to occasion." (*Johnson* v. *Lewis, supra;* Angell on Water-courses, § 403.)

The law is no doubt so and the reason is obvious. These consequences are often such as cannot easily be known except to the party injured, and he, it is said, should be presumed to acquiesce so long as he rests in silence and does not apprise the purchaser of any cause of complaint, and the latter has, therefore, a right to suppose that the structure which he has bought was rightfully erected (*Eastman* v. *Amoskeag Mfg. Co.*, 44 N. H. 143–156), and is not bound to know or suspect that before his purchase one party committed a wrong and the other submitted to it.

The cases cited also fall within the well-settled rule that one bound to do something in a certain specified event, the happening of which lies within the peculiar knowledge of the opposite party, is not in default until notice is given to him. Until then the silence of the aggrieved party is held to be evidence of a license to maintain the thing causing injury. Nearly all of them are noted in *Conhocton Stone Road* v. *Buffalo, New York & Erie Railroad Company* (*supra*), and that case stands on the same reason. It there appeared that the B. & C. R. R. Co., in 1851 or 1852, constructed an embankment and bridge as part of its road-way. The defendant became the owner of these structures upon foreclosure sale, and, in 1863, it leased the property to the Erie Railway. The structure during high-water caused an overflow to plaintiff's injury in 1864 and 1865, and for this the plaintiff recovered against the defendants' motion for a nonsuit. The judgment was reversed on the ground that proof failed to show notice or knowledge on the part of the defendant of the existence of the nuisance.

To the same effect and on similar grounds is *Wenzlick* v. *McCotter* (87 N. Y. 122), also cited by the appellant; but both cases, as well as those above referred to, involve a principle which extends only to a wrongful act done or committed in the first instance by a third party, and of which the defendant had no knowledge, and not to a neglect of duty on his part in caring for his own property. If it was the defendants' duty to maintain and put in repair the pier, no notice can be necessary to sustain an action for an injury resulting from the neglect of such duty, for whether the act causing it be one of omission or commission is immaterial. In such a case the owner is the originator of the injury, and to him the principle requiring notice does not apply. On the contrary, good sense and sound doctrine require that he who ought to abate a nuisance should answer for its continuance. Every moment that the party whose duty it is to repair fails to do so, is a new tort producing a cause of injury, and he cannot but know it to be so. Whenever, therefore, there is

damage, there is a cause of action against him who by omission produces the result complained of. Such is the result of the discussion in *Brown* v. *Cayuga & Susquehanna Railroad Company* (12 N. Y. 486), where the action was for overflowing the plaintiff's land. It appeared that the predecessor in interest had created the obstruction, and the defendant on that ground asked for a nonsuit. It was denied and the decision affirmed, the court holding, as matter of law, that the defendant was liable. Upon appeal the point was taken that no request to abate the nuisance was proven. JOHNSON, J., says: "If this matter be important to the rights of the parties, that ground should have been taken at the trial." DENIO, J., was of opinion that an action lay without notice, that it was not required by any authority, and that there was nothing in the nature of the case which required a notice to be given to the upholder of a nuisance as a condition to his being made responsible for its consequences. The words of that eminent jurist are quite applicable to the case in hand. "Every one," he says, "is bound so to use his own property that it shall not be the means of injury to his neighbors, and I think the proprietor should himself look to it, and that he cannot safely wait to be admonished before reforming what may be dangerous to others."

In *Irvine* v. *Wood* (51 N. Y. 224) the landlord was held liable and also the tenant for damages resulting to a wayfarer in a public street who stepped on the edge of the iron cover of a coal-hole, and it turning under his foot, his leg went in and he was injured. Wood claimed that he had no notice of the defect. The court held that it was his duty "to know its condition and he must be held to the same responsibility as if he had actually known it." So in *McCarthy* v. *Syracuse* (46 N. Y. 194), a sewer case. The defense was that the city officials had no notice that the sewer was out of repair. The court said: "The mere absence of this notice does not necessarily absolve the city from the charge of negligence. Its duty to keep its sewers in repair is not performed by waiting

to be notified by citizens that they are out of repair, and repairing them only when the attention of the officials is called to the damage they have occasioned by having become dilapidated or obstructed; but it involves the exercise of a reasonable degree of watchfulness in ascertaining their condition, from time to time, and preventing them from becoming dilapidated or obstructed. Where the obstruction or dilapidation is an ordinary result of the use of the sewer, which ought to be anticipated and could be guarded against by occasional examination and cleansing, the omission to make such examinations and to keep the sewers clear is a neglect of duty which renders the city liable." (See, also, *White* v. *Board of Health*, L. R., 10 Q. B. 219.)

The same principle applies here. It is in evidence, as we have seen, that the pier was in a weak and dilapidated condition when the lease was made and when the defendants became owners. From the nature of the material of which it was constructed it would, unless cared for, become weaker and more dilapidated, and consequently more dangerous to human life. Of the operation of natural causes and their effects upon such structures the defendants are presumed to have knowledge, and they could not so neglect property subject to those causes that it should for want of repair bring injury upon another without being responsible for that injury. But it is said they were non-residents or absentees. I think that is immaterial. What they were bound to know they must be deemed to have notice of, wherever they were. It was their duty to know the condition of the pier. And it is fair to presume from the single fact of proprietorship that it was known to them.

But there was not only proprietorship, there was, as we have seen, by the very terms of the lease, a right of entry and such possession as might be needful for repairs retained by the lessor. To that extent the owner was at all times in possession. And these defendants, when they became the absolute and beneficial owners of the pier, must be presumed to have known not only the situation and extent of their own interest, but the qualification made by the lease. They knew

the pier was of a material liable to decay. They knew it was actually decaying; that the tenant was under no obligation to repair, and that the right to enter for the purpose of repairing was in the lessor and formed one of the conditions of their own estate. As there was in them a right of entry, there was also a right of occupation which the tenant could not abridge.

It is true that, until the death of Mrs. De Dion, the defendants were reversioners, but they were not passive reversioners. They became owners of the property May 22, 1881, and in July, 1881, through proceedings instituted by themselves as owners of the property, they procured the appointment of Brown as receiver of the rent, and in November, 1881, obtained the order (*supra*) for its distribution, and actually received the rent. Thus they voluntarily went into the place of the ancestor and devisor, accepted the property with its emoluments, and the information which induced them to do so necessarily included its condition and so charged them with the burden which its care required. The neglect of this duty, the suffering the pier to fall into such a state of decay as to become dangerous to those lawfully coming upon it, was the creation of a nuisance. Doubtless, the original landlord would have been liable (*Swords* v. *Edgar*, 59 N. Y. 28), but the defendants, his assignees, are equally so. (*Rex* v. *Pedly*, 1 Ad. & El. 827; *Salmon* v. *Bensley*, Ryan & M. 414.) They maintained and continued it. In *Rex* v. *Pedly* the court says: "If a nuisance be created and a man purchase the premises with the nuisance upon them, though there be a demise for a term at the time of the purchase, so that the purchaser has no opportunity of removing the nuisance, yet by purchasing the reversion he makes himself liable for the nuisance."

Notwithstanding the validity of the lease, and its continuance for the full term is not questioned by the plaintiff, the general rule enunciated in this citation holds good, although we need not, and do not, go so far as to say that such would be the case if the defendants had no opportunity of removing the nuisance.

That feature is not in the case.   When a landlord is exempt
from liability on account of the bad condition of his premises,
it is because the tenant is in possession, and the owner has no
right to enter upon them; but where he has the power to pre-
vent or abate the nuisance, he is liable for an injury resulting
therefrom to third persons.   (*Clark* v. *Fry*, 8 Ohio St. 359 ;
*Ellis* v. *Sheffield*, 2 El. & Bl. 767; *Swords* v. *Edgar, supra ;
Kirby* v. *Boylston Association, supra.*)   And in this case
the defendants had not by implication only, but, as we have
seen, by the express terms of the lease, a right to enter upon
the premises and abate the nuisance.   This doctrine is enforced
with much elaboration in *Edwards* v. *New York and Harlem
Railroad Company* (98 N. Y. 245), and is fully recognized
in the still later case of *Wolf* v. *Kilpatrick* (101 id. 146),
to both of which my attention has been called.   The whole
argument of the prevailing opinion in the Edwards case is
based upon the assumption that the landlord had no right to
enter the building for the purpose of making any changes
or alterations, or to strengthen or support the galleries (the
place of accident) "in any way." and the contention that
he should go free from the consequences of the imperfect
structure was put precisely upon the ground that a contrary
rule, one which would place such responsibility "upon a
grantor or ' upon a landlord, while out of possession, and
deprived of the control of his premises," would lead to injus-
tice, and the argument is sustained by reference to cases where
the like fact appeared, viz. : *Mellen* v. *Morrill* (126 Mass. 545),
where it is said, "There is nothing to show that he (the owner)
retained any control over the walk," the place of accident.

In the *Wolf Case* (*supra*), the distinction is again drawn
between the liability of a landlord who has parted with all his
right to enter upon the demised premises and one who
retains control, and the judgment was reversed because it
established liability on the part of the landlords "who were
out of possession and control."   It cannot be said that either
the lessor or these defendants had no control over the premises
and "no opportunity of removing the nuisance," and as they

could abate it, and did not, they are liable for its continuance. Moreover, the law casts upon the owner the duty of obeying the obligation which he retained. It did not devolve upon the tenant under the lease to make repairs, and it is said in Wood's Landlord and Tenant (618), that "where a nuisance results from such want of repair, and there is no covenant to repair on the part of either the landlord or tenant, an action may be maintained against either of them therefor." It is not material whether this duty is imposed by the principles of the common law or by statute.

In *Bellows* v. *Sackett* (15 Barb. 96) the objection was made that the action should have been against the tenant in possession, and not the landlord; but it was held that to make the objection available, it should be shown that the tenant was bound to make repairs; it was not to be presumed, and JOHNSON, J., says, "however that may be, I am inclined to the opinion that, in any event, the plaintiff may resort directly to the owner as the one who keeps up and maintains the erection which causes the injury, whoever may be the temporary occupant under him."

It is very difficult to so read the lease as not to perceive a recognition by both lessee and lessor of the defective condition of the premises, their tendency to become worse, a mutual reluctance on either side to assume the burden, but resulting finally in the reservation by the lessor of a right to enter and make repairs, should "he see fit to do so." It would be most unreasonable, therefore, not to · hold him responsible for injuries resulting from apparent defects, or defects known to him, or that would have been known if he had exercised ordinary care. If repairs were necessary he was bound "to see fit" to make them.

The same liability devolves upon the defendants as assignors from the devisor. They take the benefit of the lease and under it are bound by its obligations, whether expressed in terms or incorporated by implication from the will.

As to the plaintiff's intestate, it was not optional whether the owners should make those necessary repairs or not. They

were required to do so because of the maxim already adverted
to, and which furnishes the reason for a remedy in case of
nuisance. The intestate was as lawfully on the pier as if on
a highway which he had the right to travel and use, and the
owner of the pier comes directly within the rule which
requires a party to protect a structure upon his own premises
which is dangerous to others rightfully there. It was, there-
fore, a duty on the part of the owner to put the pier in a safe
condition. (*Beck* v. *Carter*, 68 N. Y. 283.) This rule
applies to the appellants, as owners at the time of the acci-
dent. They were not nominal owners only. They availed
themselves of their title by receiving rent and acting in con-
trol of the premises. In *Inhabitants of Oakham* (*supra*),
it was claimed that a dam broke away because of its original
insufficiency and subsequent want of repair, and carried away
the plaintiff's bridges. The defendant was held not to be
responsible, the court saying: "Such liability attaches only
to a party who transfers an estate with the original wrong, or
who receives rent or other consideration for its continuance "
(*Roswell* v. *Prior*, Salk. 460; *Rex* v. *Pedly*, 1 Ad. &
El. 822); but, say the court, the defendant did nothing of the
kind. He was himself never in possession of the estate. He
did not demise it; he received no rent and never claimed that
the Messrs. Dexter (the persons actually in possession) were
his tenants. He did nothing to vindicate or affirm his own
title against theirs. * * * . If the title was in him, he
was not obliged to assert it; if he considered the burden
attached to the estate greater than its benefits, he was not
obliged to assume it." The defense succeeded, therefore,
because the defendant neither built nor occupied the prem-
ises, nor by any bargain or act of his own authorized any
other person to occupy them. Here the defendant's case is
quite otherwise. They maintained the terms of the lease.
They recognized the tenant as their tenant, not only technically,
but in a substantial manner and by affirmative proceedings.

They took the entire estate, and if they took subject to the
lease, it was because they chose to do so. The rent was inci-

dent to the reversion and followed it. The defendants, there-
fore, were put at once to their election to reject the devise or
assume the title and treat the person then in possession under
the lease as a tenant. By undertaking the control and receiv-
ing rent they made their election. They became his landlord
and he their tenant. They come, therefore, within the general
rule that the receipt of rent is an upholding and continuing
of the nuisance. (*Gandy* v. *Jubber*, 5 B. & S. 78; *Todd* v.
*Flight*, 9 C. B. [N. S.] 377; *Swords* v. *Edgar*, *supra*.)

Nor is it any answer that a receiver had been appointed of
the rents and issues of this property, or that the court refused
to direct an action to be brought against him. His duties
were specific, and it does not appear that the injuries com-
plained of resulted from his negligence, default or misconduct,
or that the plaintiff had any claim against the fund or prop-
erty in his hands, but, in any aspect, it was in the discretion of
the court which appointed him to take cognizance of the
receiver's liability, if any, and determine it, or permit the
aggrieved party to sue at law. Its decision cannot affect
the present litigation. The receiver merely represented the
owners of the pier, or those entitled to the rents and profits,
and because, on their application, he was directed to pay a
portion of the receipts upon necessary repairs, it in no respect
exonerates the owners or those who would otherwise be liable
for their own neglect. He had no exclusive power, nor was
that the character of the jurisdiction of the court. As to the
question involved, his official position was no better screen
for the defendants than would have been that of a common
agent selected by the parties without the interposition of the
court. The property was leased. The receiver was directed
to receive the rents, with a portion repair the property, and do
certain other things respecting it, and divide the residue. He
had neither possession of nor control over it. This action
interferes with no act or duty on his part.

The case of *Metz* v. *Buffalo, C., etc., Railroad Company*
(58 N. Y. 61), cited by the appellant, was that of a corpora-
tion over whom, against its will, a receiver in bankruptcy had

been appointed, and a distinction in its favor is taken by the court upon that ground. GROVER, J., says: "It must be borne in mind that the defendant was not a voluntary bankrupt. The appointment of a receiver was against its will. It had nothing to do with his appointment." By the act of the law its possession was taken from it and given to others. And they, by negligent running of the road, caused the injury complained of. Here it is otherwise. The appointment was at the request of the defendants, and it was their business to see that the property did not become a nuisance. They could not shift the responsibility. In the case of the *Mayor* v. *Bailey* (2 Denio, 433), it was held that the owner of real estate was responsible for the negligence of water commissioners, although appointed by public authority to make erections upon it, but upon the ground that they acted at the instance and for the benefit of the corporation, the city was held liable. It would be unreasonable to deprive an injured party of his remedy because, at the request of the owner of property, a receiver of its rents had been appointed with power to apply a part of those rents to repairs. It is to be noticed that the whole annual rent of the pier was $750; of this (assuming distribution to be made) one-fourth only, or less than $200, could be applied by the receiver to repairs. By what rule of law or justice is it that an owner of property, by pledging part of his income, can reserve to himself the rest free from the claims of his creditors or those who, through his neglect of duty, involuntarily become entitled to compensation at his hands. Could the owners of this pier, by depositing a portion of its rents and directing their application to repairs, rid themselves of liability to expend other moneys, and more if necessary, to that purpose? Yet they have done nothing else. Owning much property, including the pier in question, they say to the court: "We are seeking, through you, to divide these estates, but, in the meantime, we need the income wholly or in part for our maintenance; let the receiver set apart so much as at the end of the year shall be sufficient for taxes, insurance, necessary repairs, etc., and pay

us the balance every quarter. The court yields to their request. The receiver does not make the repairs, whether for want of money or otherwise does not appear, and so a life is lost. Is it an answer to a claim for indemnity that some money was set apart in the hands of an agent to make repairs? Suppose the money was not enough, or the agent or receiver was unmindful of its just expenditure, is the claimant to bear the burden of its insufficiency, or of his neglect? Where has it ever been held that anything less than the whole estate of a man was liable in such a case, or that proceedings for indemnity should be *in rem*, or against the rents issuing from the nuisance? Suppose the whole income had been retained by the court on the application of the owners of the property, and still the accident happened, would not the representatives of the party injured be entitled to redress from other property belonging to the same person? Surely he would. If the damages were payable only from the rents and the receiver had all the rents, the case might be different. The owner is responsible for the consequences of his omissions, and whether they are his own or his agent's, and although the agent is called a receiver, so far as the interests of third parties are concerned, they must always be considered as the omissions of the owner. No court can bind a person not before it. The plaintiffs suffer from a tort committed by the defendants; and from the obligation so incurred, they should be relieved only by making compensation to the extent of the damage. They could neither before its commission or after avoid it by setting apart, even by permission of the court, a certain proportion of their estate. No court has that power, nor can it endow its receiver with such a function. It did not attempt to do so. It permitted the application of certain money. It did not even profess to relieve the owner from responsibility for the condition of the pier. Nor was the receiver appointed for the purpose of keeping parties injured from the prosecution of their rights. It has already been seen that the intestate was lawfully on the pier as a public place.

A duty rested somewhere to keep it reasonably safe and secure for him. Primarily that duty rests upon the owners. In this instance it is true that they became such as devisees, but they were not bound to accept the gift. Before doing so they must be deemed to have ascertained its quality and determined whether, under all the circumstances, it was worth the taking. Among these circumstances was the decayed and dangerous condition of the pier, and the lease with its reservations, limitations and restrictions.

They succeeded to the burden as well as to the advantages of ownership. Under the lease the lessor and his successors in interest remained charged as to third persons with the duty of repair. They had the right to enter for repairs, and so were bound to make them. They cannot be relieved from its performance by the undertaking of another party, although that undertaking is sanctioned by the court, that he will apply a portion or all the money received under the lease for that purpose. Neither the plaintiff nor the injured person was a party to such agreement or order, and the obligation of the receiver in that respect is a matter solely between him and the appellants, and cannot relieve the latter from their liability to third parties.

The case states that the defendants' counsel excepts " to that part of the charge in which the court says that the owners — the defendants in this case — are liable if the pier was defective at the time the lease was made."

The part of the charge to which attention is directed is, I suppose, the following : " If you believe this pier was out of condition at the time the lease was made, and that it continued so up to the time of the accident, the defendants are liable. Having succeeded, upon the death of Mrs. De Dion, to the ownership of the premises, they are absolutely freed from any trust which may have vested in Mr. McCarty, her trustee."

The charge as given was correct and justified upon the principle which led to the decision in *Swords* v. *Edgar* (*supra*) ; and the rule there declared that if " at the time of the demise and delivery or possession to the lessee, it is in a defective and

unsafe condition, and in consequence thereof, while in the possession of the lessee, an injury happens to one lawfully thereon, the lessor, who is receiving a benefit by way of rent or otherwise, is liable."

It involved not only a defective condition of the pier at the time of the demise, but a condition causing an injury, or, as the trial judge said, " a condition which continued up to the time of the accident." For this condition the defendants, as owners, were responsible, and neither their absence from the state nor the intervention of a lease or a receiver could protect them against the claim of one suffering from it.

The judgment of the court below should, therefore, be affirmed, with costs.

ANDREWS, FINCH and PECKHAM, JJ., concur with EARL, J.; RUGER, Ch. J., and GRAY, J., concur with DANFORTH, J., dissenting.

Judgment reversed.